Lindsey Wagner
Scott Wagner & Associates, P.A.
3900 W Alameda Ave Suite 1200
Burbank, CA 91505
Tele: (213) 377-5200
Fax: (561)653-0008
Email: LWagner@scottwagnerlaw.com
Mail@scottwagnerlaw.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

RICHARD B. SWINTON,

                              Plaintiff,

v.

JAMES MATTIS,
(Secretary, Sued in his Official Capacity),

                              Defendant.

Case No.: 18CV0381 LAB MDD

**AMENDED COMPLAINT AND JURY DEMAND**

        COMES NOW, Plaintiff, Richard Swinton, by and through his attorney, Lindsey Wagner, and with written consent to amend from the opposing party, and for his first amended complaint against the Defendant states and alleges as follows:

## **I. PARTIES**

1.      Plaintiff, Richard Swinton (hereinafter "Swinton") is a male citizen and resident of the United States, and Ventura County, State of California, and is Caucasian.  At all times relevant to this Complaint, Swinton was classified as mentally disabled by Federal Regulations; his disabilities were as follows: anxiety and depression. At all times relevant

1

to this Complaint, Plaintiff was employed by the Defense Contract Management Agency, a component of the Department of Defense, until his removal effective August 21, 2015.

2.     Defendant, United States Department of Defense (hereinafter "Agency"), is an Executive Branch department of the federal government charged with coordinating and supervising all agencies and functions of the government concerned directly with national security and the United States Armed Forces.  The Department of Defense is headed by the Secretary of Defense and comprised of numerous sub-agencies and components, including the Defense Contract Management Agency (hereinafter "DCMA"), which works directly with Defense suppliers to ensure that the Department of Defense, Federal, and allied government supplies and services are delivered on time, at projected cost, and meet all performance requirements.  The name of the organization where Swinton worked at the time that he was subjected to discrimination and retaliation was the Defense Contract Management Agency, Western Regional Command, at 34 Civic Center Plaza, Room 5001, Santa Ana, California 92701-4056.

## II.  JURISDICTION AND VENUE

3.     This action is brought to remedy discriminatory acts pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., and the Rehabilitation Act, 29 U.S.C. § 701, et seq., and retaliatory acts pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended, and violations of 5 U.S.C. § 43, and 5 C.F.R. § 432.

4.      Jurisdiction of this Court is invoked pursuant to its original jurisdiction over cases and controversies arising under federal law, pursuant to 28 U.S.C. § 1331.

5.      Venue herein is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 633a(c), 29 U.S.C. § 794(a)(a), and under 28 U.S.C. §1331.  Defendant, United States Department of Defense, and sub-agency Defense Contract Management Agency, exist under the laws of California.  The alleged unlawful and wrongful acts of discrimination and retaliation were committed in San Diego, California, in the Southern District of California.

### III.  PROCEDURAL REQUIREMENTS

6.      Plaintiff filed a formal complaint of discrimination on or around May 22, 2015, complaining of acts of age discrimination, disability discrimination, and retaliation alleged herein.

7.      Defendant removed Plaintiff from his position of Contract Price/Cost Analyst with the Defense Contract Management Agency and the federal government, effective August 21, 2015.

8.      Plaintiff amended his formal complaint of discrimination on September 2, 2015, and again on October 20, 2015, and received his Notice of Post-Investigative Rights on or about April 8, 2016.  The Notice of Post-Investigative Rights directed Plaintiff to elect a hearing with the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC").

9.      Plaintiff submitted a hearing election to the EEOC on or about May 6, 2016.

10.     Defendant notified Plaintiff that Defendant had made an error in providing post-investigative rights and should have directed Plaintiff to the Merit Systems Protection Board (hereinafter "MSPB" or "Board") on or about May 12, 2016, and directed Plaintiff to withdraw his EEOC Hearing Request, and seek a Final Agency Decision which could be appealed to the MSPB.

11.     Plaintiff withdrew his hearing request at the EEOC on or about May 31, 2016, and the EEOC dismissed Plaintiff's hearing request on August 12, 2016.  The EEOC further directed Defendant to issue a Final Agency Decision.

12.     Defendant issued a Final Agency Decision on or about October 3, 2016, and provided Plaintiff with MSPB appeal rights.

13.     Plaintiff submitted a timely appeal to the MSPB on or about October 31, 2016, challenging the Agency's removal decision.

14.     On August 14, 2017, Administrative Judge Slizeski affirmed Defendant's performance-based removal of Plaintiff.

15.     On or about October 18, 2017, Plaintiff filed a timely petition with the EEOC requesting review of a Final Order issued by the MSPB concerning his claims of discrimination and retaliation.

16.     The EEOC's Office of Federal Operations issued its decision, on or around January 17, 2018, and received by Plaintiff and his representatives on or about January 22, 2018, which concurred with the Board's final decision that Plaintiff did not establish that

Defendant discriminated against him as alleged.  The OFO noted in this decision that Plaintiff had no further right to administrative appeal from the Commission's decision.

17.     Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title VII, the ADEA, as amended, and the Rehabilitation Act.  The jurisdiction of the Court is proper pursuant to 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 633a(c), 29 U.S.C. § 794(a)(a), and under 28 U.S.C. §1331.

## IV.  GENERAL ALLEGATIONS

18.     At all times relevant hereto, Plaintiff, Richard Swinton, was employed by the United States Defense Contract Management Agency, a component of the Department of Defense, and was a resident of San Diego County, State of California.  Plaintiff is currently a resident of Ventura County, State of California.

19.     At all times relevant hereto, Defendant, United States Department of Defense, is a Federal government Agency, doing business in the Southern District of California.

## V.  FACTS

20.     Swinton worked as a GS-1102-12, Contract Price/Cost Analyst, for the Defense Contract Management Agency ("DCMA"), Western Regional Command, a component of the Department of Defense in San Diego, California.

21.     Swinton is a sixty-seven (67) year old, Caucasian male who amassed approximately twenty-nine (29) years of Federal service prior to his removal.  Swinton began his duties as a Contract Price/Cost Analyst with DCMA in 2004, and was removed on August 21, 2015.  Swinton was the second oldest Contact Price/Cost Analyst at

DCMA San Diego, and the most experienced.  The fact that Swinton is over age forty is apparent both by looking at Swinton, and based on Swinton's years of federal service.

22.     At all relevant times, Swinton's first level supervisor was Mr. Danilo Yu (YOB: 1948) and his second level supervisor was Mr. Jahn Enger (YOB: 1959).  Both Mr. Yu and Mr. Enger admit being aware that Swinton is in at least his late fifties or early sixties.

23.     At all times relevant to this complaint, Ms. Tina Garner (YOB: 1970) served as the DCMA San Diego Deputy Commander, and Swinton's third level supervisor.

24.     At all times relevant to this complaint, Captain Richard McCarthy (YOB:1969) served as the DCMA San Diego Commander, and Swinton's fourth level supervisor.

25.     At all times relevant to this complaint, Colonel Glenn Graham (YOB: 1965) served as the DCMA West Region Commander, and Swinton's fifth level supervisor.

26.     At all times relevant to this complaint, Ms. Lorraine Kimball (YOB:1946), Mr. Richard Marini (YOB: 1974), and Mr. Jose Gutierrez (YOB: 1981) also worked with Swinton.  Swinton and these employees shared the same title, same grade, and same duties and responsibilities; however, Swinton and Ms. Kimball were both over twenty (20) years older than their colleagues.

27.     In or around late December, 2013, Swinton received a performance evaluation rating his performance as "fully successful."  Mr. Enger even went so far as to remark that Swinton's performance had been "fully successful" and "exemplary" for the past ten (10) years of performance evaluations.

28.     On or about January 7, 2014, Mr. Yu assigned Mr. Swinton responsibilities as a Cost Monitor for the ViaStat account, while also expecting Swinton to complete his Contract Price/Cost Analyst duties.

29.     A Cost Monitor must be assigned to a contractor when that contractor has more than $250 Million worth of government contracts.  The Cost Monitor monitors the contractor's expenses from month to month and provides monthly and quarterly reports regarding the specific contractor.  The Office of Personnel Management defines Cost Monitoring as a full-time job.

30.     In or about August, 2013, DCMA Instruction 123 was issued.  Instruction 123 identifies Cost Monitoring as a full-time position and instructs the Agency to assign a full-time employee to each account which requires cost monitoring.  Instruction 123 further provides a process for requesting a waiver of the requirement that Cost Monitoring be a full-time position.

31.     On January 23, 2014, the Agency provided Swinton with Position Performance Plan for 2014, which included Cost Monitoring Support as a function of his Contract Cost/Price Analyst role, and provided that his position was responsible for providing cost monitoring support in accordance with DCMA Instruction 123.

32.     Swinton tried to complete the duties of both of his positions to the best of his ability, but was unable to keep up and began having difficulty managing his workload.

33.     Swinton repeatedly attempted to address his workload with his supervisors but did not receive any assistance.  Instead, Swinton's supervisors insisted that he had not been given two full-time jobs.

34.     In March, 2014, Ms. Lorraine Kimball, one of Swinton's colleagues, and the oldest Contract Price/Cost Analyst, was assigned Cost Monitoring duties for another account, while also being expected to perform full-time Contract Price/Cost Analyst duties.  None of Swinton's younger colleagues were ever assigned Cost Monitoring duties.

35.     In May, 2014, Mr. Yu assigned Swinton a Contract Price/Cost Analyst case for Radeus Labs.  In order for Swinton to complete his assignment for this case, he required additional information from the contractor, which was not provided for approximately one (1) month.  When Swinton did receive the information, the proposal was inadequate, and could not be worked on per Agency policy.  Swinton notified Mr. Yu of the inadequacy of the proposal and was instructed to complete it anyway.

36.     In early July, 2014, Mr. Yu took the, still inadequate, Radeus Labs case and assigned it to one of Swinton's younger colleagues, who also noted that the proposal was inadequate and could not be completed.

37.     Approximately three (3) weeks after Mr. Yu transferred the Radeus Labs case, he issued written discipline for Swinton's failure to complete the, still inadequate, case, and revoked either Swinton's Alternate Work Schedule or Authorized Time for Physical Fitness.

38.     Following the Radeus Labs case, Mr. Yu assigned Swinton the Solute case. Completion of this case required additional information from the requestor, and the requestor failed to provide the needed information for over one (1) month.  Swinton completed the project as soon as he received the necessary additional information from the requestor, however, the delay caused the project as a whole to be delayed.

39.     In early October, 2014, Mr. Yu issued Swinton additional written discipline for missing the Solute deadline, and revoked either Swinton's Alternate Work Schedule, or Authorized Time for Physical Fitness, whichever had not previously been revoked.

40.     As a result of the extreme stress Swinton found himself under at work, in October, 2014, Swinton began visiting a psychiatrist, Dr. Mark Melden, who prescribed mediation for Swinton to treat depression and anxiety which manifested in part as suicidal thoughts, caused by the stress Swinton was under as a result of being assigned two (2) full-time jobs.  One of the medications prescribed, Pristiq, caused side-effects which decreased Swinton's ability to focus and left him easily confused.  This caused his work to slow down.  Swinton provides that he did not suffer from any mental disabilities prior to being assigned two full-time jobs.  The stress of both jobs caused Swinton to experience extreme stress which developed into depression and anxiety.

40.     In or around early November, 2014, Mr. Yu assigned Swinton the Polorex Case. All of the Polorex records were located in Manassas, Virginia, and when Swinton alerted Mr. Yu to this, Mr. Yu provided that he would transfer the case to Virginia.  As a result, Swinton did not work on the case, believing it was to be transferred.  When the

completion deadline approached, Swinton realized that the case had not been transferred, but was unable to obtain all of the information necessary to complete the assignment on time.

41.     On November 6, 2014, Swinton's psychiatrist provided the Agency with a note detailing Swinton's mental health problems and stating that Swinton's workload needed to be reduced.  Swinton provided this letter to Mr. Enger, who directed Swinton to pass the note on to Mr. Barry Wade to be processed as a reasonable accommodation request. While this was the first written request Swinton made for reasonable accommodation, he repeatedly addressed his workload with his supervisors prior to providing medical documentation, however nothing was done to reduce Swinton's workload.

42.     When questioned about providing Swinton with a reasonable accommodation, his supervisors have stated both that Swinton never made such a request, and that his request was granted before he submitted the request.

43.     On December 18, 2014, Mr. Enger placed Swinton on a Performance Improvement Plan ("PIP") which was scheduled to last ninety (90) days and be administered by Mr. Yu.  The PIP specifically identified the Radeus Labs, Solute, and Polorex cases as the basis for the PIP.

44.     While on his PIP, Swinton was assigned an additional Contract Price/Cost Analyst case which was labeled as requiring a Top-Secret clearance.  Swinton has Secret clearance, but not top-secret clearance and immediately brought this issue to Mr. Yu's attention.  Mr. Yu instructed Swinton to complete the case anyway.  Mr. Yu attempted to

gather all of the information needed to complete the case but was denied access to some information based on his security clearance. Mr. Yu then disciplined Swinton for failing to complete the report in a timely manner.

45.     On or about March 18, 2015, Swinton's PIP concluded, but Swinton did not receive any report or information regarding whether his completion of the PIP was successful or not.

46.     On or about May 22, 2015, Swinton filed a formal Equal Employment Opportunity Complaint against his supervisors.

47.     In or around the first week of June, 2015, Mr. Yu publicly criticized Swinton in front of the entire work team for not completing assignments in a timely manner. Out of frustration, Swinton made an, admittedly snide, remark about not receiving any response to his PIP by the deadline for the Agency to have provided Swinton with the outcome of his PIP.

48.     On or about June 25, 2015, the Agency proposed to remove Swinton from federal service based on his failure of his PIP.

49.     Upon proposing his removal, the Agency further removed Swinton's duties and assigned him to assist with a large document shredding project. This project caused boxes to pile up outside of Swinton's office which blocked the emergency fire exit and created a fire hazard.

50.     Effective August 21, 2015, the Agency decided to remove Swinton from federal service. Swinton's supervisors asked that Agency security personnel be present when

Swinton was escorted from the building, despite admitting that they were not concerned about Swinton's reaction.

51.     Shortly after being assigned Cost Monitoring duties, Swinton informed Mr. Enger that Agency policy provided that the position was full time.  Mr. Enger provided that he discussed the matter with Ms. Joan Sherwood, Director of DCMA Cost and Pricing.  Ms. Sherwood informed Mr. Enger that she would not change the policy, but provided that a waiver could be requested.  As an alternative, Mr. Enger could assign Swinton only Cost Monitoring duties, and no pricing cases.  The Agency admits that no waiver was ever requested, and that Swinton continued to be assigned cost pricing cases.

52.     In or around early April, 2015, the Agency threw a birthday celebration for Swinton, during which he stated that he was sixty-five (65).  As Swinton's supervisors were present for the celebration, they, along with Swinton's coworkers were made aware of Swinton's age.

53.     Mr. Yu was interviewed in connection with Swinton's informal EEO complaint on or about February 25, 2015, demonstrating that he was aware of Swinton's EEO activity long before issuing his decision regarding Swinton's completion of the PIP or proposing Swinton's removal.

## VI.  FIRST CAUSE OF ACTION

### Age Discrimination

54.     Plaintiff repeats, re-alleges, and incorporates by reference every allegation contained in paragraphs 1-53, above, as if fully set forth.

55.     Plaintiff Richard Swinton is a member of a protected class based upon his age. Swinton was born in April, 1950, and was over the age of forty (40) at all relevant times.

56.     Swinton's supervisors each admit being aware that Swinton was, at all relevant times, over the age of forty (40).  Swinton's physical characteristics are further consistent with being over the age of forty, as is Swinton's length of federal service.

57. Mr. Enger and Mr. Yu (both over 40) treated Swinton differently than his coworkers based upon his age.  Swinton was assigned a second full-time position of Cost Monitoring, identified by both OPM and DCMA as a full-time position, and was expected to complete the duties of both Cost Monitor and Contract Price/Cost Analyst. This effectively amounts to disparate treatment because Mr. Enger and Mr. Yu only assigned addition Cost Monitoring duties to Swinton and Ms. Kimball, the oldest two employees, while employees outside of Swinton's protected group were not assigned extra duties.  Even in the case of employees who were over forty and did not receive extra duties, they were over twenty (20) years younger than Swinton and Ms. Kimball.

58.     Mr. Enger and Mr. Yu stated that the decision to assign Swinton Cost Monitoring duties was based on his longevity with the Agency and in his position, and his experience, which led them to believe that he would be able to handle the increased work load.  However, when it became clear that the increased work load was overwhelming for Swinton, Mr. Enger and Mr. Yu did nothing to decrease the work load back to one job, instead they placed Swinton on a performance improvement plan and subsequently removed him from federal service.  Furthermore, neither Swinton nor Ms. Kimball had

ever received any training in Cost Monitoring which would have positioned them as more experienced with the tasks than their younger colleagues.

59.     Ms. Kimball, the only other employee to be assigned Cost Monitoring duties, provided that she also felt the work load was unmanageable, and even developed pneumonia as a result of the stress she was under.

60.     Even if the Agency did not intend to discriminate against Swinton on the basis of his age, the Agency's policy of assigning Cost Monitoring duties to its oldest Contract Price/Cost Analysts, despite it being classified as a full-time job, had a clearly disparate impact on the employees who were assigned the work, as they both became sick, and struggled to complete extra assignments and a significantly greater workload than their younger peers.

61.     Swinton's inability to complete work assignments came as a direct result of his being discriminatorily assigned a second full-time job by his supervisors.  This improperly motivated his removal in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

62.     As a result of the Agency's actions described above, Defendant is liable to Swinton for those violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

63.     The Plaintiff has suffered serious economic loss, and serious mental distress as a result of this unlawful age discrimination.

64.     It has been necessary for the Plaintiff to retain the services of an attorney to redress these wrongs.

65.     Plaintiff is entitled to be fully compensated for all the damages he has sustained.

66.     Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damages as a result of the alleged discriminatory practices unless and until this Court grants relief.

## VII.  SECOND CAUSE OF ACTION

### Disability Discrimination

67.     Plaintiff repeats, re-alleges, and incorporates by reference every allegation contained in paragraphs 1 – 66, above, as if fully set forth.

68.     Plaintiff, Richard Swinton, is a member of a protected class based upon his mental disabilities.  At times relevant to the discrimination alleged herein, Plaintiff suffered from depression and anxiety.

69.     After being assigned the second full-time role of Cost Monitoring, in January, 2014, Swinton began feeling extremely stressed and overwhelmed.  As a result of these feelings, Swinton made numerous verbal requests to his supervisors, Mr. Yu and Mr. Enger, for his workload to be reduced so that he could better manage his stress.  Swinton considered these requests to be requests for reasonable accommodation.

70.     Swinton's supervisors provided no accommodations in response to Swinton's request for a reduced workload.  The Agency never even engaged Swinton in the interactive process to determine whether an accommodation would be possible.

71.   In October, 2014, Swinton began seeing a psychiatrist who diagnosed him with severe depression and anxiety, which manifested occasionally as suicidal thoughts.  In November, 2014, Swinton provided these medical records to the Agency in further support of a request for reasonable accommodation.  In response, the Agency directed Swinton to be examined by a doctor of the Agency's choosing who recommended a reduced workload.

72.   As this request was submitted in November, 2014, it is clear that Swinton's supervisors, Mr. Yu and Mr. Enger, were aware of Swinton's disability no later than November, 2014, prior to Swinton's placement on a PIP and removal.

73.   Prior to being assigned Cost Monitoring duties, Swinton's performance was rated as fully successful and excellent, making it clear that Swinton was able to perform the duties of his original full-time position.  Providing a reasonable accommodation of only assigning Swinton one (1) job would have permitted him, based on his past performance, to successfully perform the essential functions of his position.

74.   In making his request for reasonable accommodation, Swinton merely requested that the Agency follow its own policy, which defined both Contract Cost/Price Analysis and Cost Monitoring as separate, full-time positions, and assign him only one (1) full time position.

75.   Swinton's supervisor, Mr. Yu, freely admits that he was aware that Swinton had made a request for reasonable accommodation, but that he did not engage Swinton in the interactive process because he had accommodated Swinton prior to his making a request.

However, in another instance, Mr. Yu claimed that the Agency first learned of Swinton's disability on November 13, 2014, when he submitted the formal request for reasonable accommodation.  It is not possible for the Agency to have accommodated a disability it was not aware existed, yet Mr. Yu claims that he had accommodated Swinton's disability prior to learning about it.

76.    Mr. Yu provided that he had accommodated Swinton by reducing his workload, however, between June 30, 2014, and June 26, 2015, there was only one week, the week of February 18, 2015, where Swinton had the fewest pricing cases as compared to his coworkers.  There were many weeks where Swinton had the most pricing cases, specifically from June 30, 2014, through July 21, 2014, and again as of August 26, 2014.  During Swinton's PIP, his workload was roughly the same as that of his coworkers, demonstrating that, despite the Agency's assertions, his workload was not reduced below that of his coworkers.  Furthermore, none of the price case assignments take into account any Cost Monitoring work that was assigned at the time.

77.    As the Agency's assertions that Swinton was accommodated before requesting accommodation are demonstrably false, and Mr. Yu admits to never engaging Swinton in the reasonable accommodation interactive process, it is clear that the Agency's failure to accommodate Swinton was in violation of the Rehabilitation Act, 29 U.S.C. § 701, et seq.

78.    The Agency's failure to accommodate Swinton resulted in his being placed on a PIP, which prompted his removal from federal service.

79.     As a result of the Agency's actions described above, Defendant is liable to Swinton for those violations of the Rehabilitation Act, 29 U.S.C. § 701, et seq.

80.     The Plaintiff has suffered serious economic loss, and serious mental distress as a result of this unlawful disability discrimination.

81.     It has been necessary for the Plaintiff to retain the services of an attorney to redress these wrongs.

82.     Plaintiff is entitled to be fully compensated for all the damages he has sustained.

83.     Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damages as a result of the alleged discriminatory practices unless and until this Court grants relief.

## VIII.  THIRD CAUSE OF ACTION

### Retaliation

84.     Plaintiff repeats, re-alleges, and incorporates by reference every allegation contained in paragraphs 1 – 83, above, as if fully set forth.

85.     Plaintiff, Richard Swinton, engaged in protected equal employment opportunity ("EEO") activity when he made initial contact with the Agency's EEO office on January 16, 2015, when he filed a formal complaint of discrimination on May 22, 2015, and when he amended his complaint in September and October, 2015.  He further engaged in protected activity when he submitted a request for reasonable accommodation in November, 2014.  In his complaint, Swinton alleged that he was subjected to disability discrimination based on the Agency's failure to accommodate him, and to age

discrimination in the workplace based on both theories of disparate treatment and disparate impact, and harassment.

86.     Swinton engaged in protected activity through participation in the statutory complaint process when he filed a discrimination complaint with the Equal Employment Opportunity Commission, and when he submitted a request for reasonable accommodation to the Agency.

87.     Swinton was diagnosed with anxiety and depression and made a good faith request for reasonable accommodation to his supervisors and through the Agency's reasonable accommodation process.

88.     Swinton had a good-faith belief that Mr. Yu and Mr. Enger, along with the rest of his supervisory chain, subjected him to discrimination based on his disability through their failure to accommodate him, and based on his age.

89.     After Swinton submitted his request for reasonable accommodation, he was placed on a Performance Improvement Plan, within one (1) month, but was never engaged in the interactive process.

90.     After Swinton filed his EEO complaint, he was notified that he had failed his PIP, which had ended approximately two (2) months before he filed the Complaint, his removal was proposed and he was subsequently removed from federal service.

91.     In the above-identified instances, Defendant, by and through its employees and agents, subjected Swinton to adverse treatment that would be reasonably likely to deter other employees from engaging in protected activity.  Plaintiff was denied reasonable

accommodation, placed on a PIP, detailed out of his duties, and subsequently removed from federal service, all within quick succession to his engaging in protected activity.

92.    Swinton's repeated requests for reasonable accommodation, which were made to his supervisors, prompted his placement on a PIP.  Swinton was placed on a PIP approximately one (1) month after he submitted a formal request for reasonable accommodation.

93.    Swinton's further engagement in protected activity, when he named his first and second level supervisors as the responsible management officials in his EEO complaint, was the cause of the adverse actions leading up to Swinton's removal, and prompted the harassment Swinton was subjected to leading up to his removal.

94.    Within weeks of Swinton contacting the Agency EEO office to file a complaint, Mr. Yu assigned him the Tapestry Solutions case, requiring a top-secret clearance despite the fact that Swinton did not have a top-secret clearance.  As this case was intended to be part of Swinton's PIP, his inability to access necessary material for the case set Swinton up for failure during his PIP.  On January 27, 2015, Mr. Yu further criticized Swinton for providing an unsigned draft of a report to a customer, despite this being common practice among Swinton's colleagues.  Prior to his making EEO contact, Swinton avers that sending a draft report had never been a problem.

95.    Within one (1) month of Swinton's filing his formal EEO complaint, he was informed that he had failed his PIP, which had ended months earlier.  His duties were subsequently removed and he was ordered to shred documents each day.  Mr. Yu directed

employees to place boxes of papers to be shred in Swinton's cubicle, blocking the emergency fire door exit and creating a fire hazard.  The determination that Swinton failed his PIP was the direct cause of his removal from federal service.  Following the Agency's decision to remove Swinton, Mr. Yu and Mr. Enger continued to harass Swinton when they requested that two uniformed security guards be present when Swinton was escorted out of the building upon his removal.  While the guards did stay in the office, and Mr. Yu ended up escorting Swinton from the building, Swinton avers that his coworkers saw the security guards arriving, which caused him humiliation and embarrassment.

96.    The harassment Swinton endured was sufficiently severe and pervasive so as to affect a term, condition, or privilege, of his employment.  Swinton was forced to endure ongoing harassment and disparate treatment as a part of his employment until he was removed from the Agency.

97.    As a result of the Agency's actions described above, Defendant is liable to Swinton for those violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

98.    The Plaintiff has suffered serious economic loss, and serious mental distress as a result of this unlawful retaliation.

99.    It has been necessary for the Plaintiff to retain the services of an attorney to redress these wrongs.

100.    Plaintiff is entitled to be fully compensated for all the damages he has sustained.

101.   Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary damages as a result of the alleged discriminatory practices unless and until this Court grants relief.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, respectfully requests that this Court enter a judgment:

(a) Declaring that the acts and practices complained of herein are in violation of Title VII, The Age Discrimination in Employment Act, and the Rehabilitation Act;

(b) Enjoining and permanently restraining these violations of Title VII, The Age Discrimination in Employment Act, and the Rehabilitation Act;

(c) Reinstating Plaintiff to his former position;

(d) Directing Defendants to take such action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(e) Compensating Plaintiff for his compensatory damages and actual damages;

(f) Removing all negative information related to this matter from Plaintiff's official personnel file;

(g) Providing back pay from the date of Plaintiff's removal to the present;

(h) Awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as provided by § 706(k) of Title VII, 42 U.S.C. § 2000e-6(k); and

(i) Granting such other and further relief as this Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Pursuant to Rule 39(b) of the Federal Rules of Civil Procedure, Plaintiff, by and through his attorney of record hereby demands a jury trial of all of the issues in the above matter.

DATED this 18th day of May, 2018.

Respectfully submitted.

SCOTT WAGNER & ASSOCIATES, P.A.
3900 W. Alameda Ave.
St. 1200
Burbank, CA 91505
Telephone: (213) 377-5200
Facsimile: (561) 653-0020

s/Lindsey Wagner
Lindsey Wagner, Esq.
California Bar No. 309808
Primary e-mail: LWagner@scottwagnerlaw.com
Secondary e-mail: mail@scottwagnerlaw.com
www.EmploymentRightsCalifornia.com

**SERVICE LIST**
**Case No.: 18CV0381 LAB MDD**

Paul L. Starita
Assistant U.S. Attorney
Southern District of California
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
*VIA EMAIL*