# Exhibit 4

MSJ-057

## Declaration under Penalty of Perjury

I, Richard B. Swinton, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## EEO Complaint of Richard B. Swinton
## Agency Docket No.: DCMA-P8-15-0148

Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity), by his Defense Contract Management Agency (DCMA) San Diego and Western Regional Command supervisory chain when:

1. From January 7, 2014 to present, Mr. Danilo L. Yu, Contracting and Pricing supervisor, increased his workload and assigned him Cost Monitor duties in addition to his Contract Price/Cost Analyst duties;

2. Between May 2014 and February 5, 2015, his supervisory chain of command subjected him to harassment. He provided the following information to support his claim:
   a. In May 2014, Mr. Yu failed to provide him with the required pivot tables' training to meet the new cost monitoring report requirements;
   b. On June 9, 2014, Mr. Yu assigned him to the Radeus Labs case, an inadequate subcontract proposal, that had missing key information;
   c. On July 15, 2014, Captain Richard K. McCarthy, U.S. Navy, Commander, DCMA San Diego, did not take action when he informed him that he was assigned the duties of two full-time positions;
   d. On July 15, 2014, Colonel (Col) Glenn Graham, U.S. Air Force, DCMA Western Regional Command, did not take action when he informed him that he was assigned the duties of two full-time positions;
   e. On July 28, 2014, Mr. Yu rescinded his Alternate Work Schedule (AWS) that included the four days/ten hours work option;
   f. On November 13, 2014, he provided medical documentation to Mr. Yu requesting a reasonable accommodation (RA) and to date no decision was provided;
   g. On December 18, 2014, Mr. Jahn Enger, Contracts Director, issued him a Decision to Reprimand following the Notice of Proposed Reprimand he received from Mr. Yu on November 13, 2014, citing failure to follow instructions and meet deadlines;

*Page 1 of 71 Pages*
Declarant's Initials ⟋⟍ ⟍

h.   On December 18, 2014, Mr. Yu issued him a Notification of Unacceptable Performance and Issuance of a Performance Improvement Plan (PIP);

i.   On January 6, 2015, Ms. Tina M. Garner, Deputy Commander, did not take action when he informed her about Mr. Yu not responding to his e-mails pertaining to the Polarix and Solute pricing case proposals;

j.   On January 27, 2015, Mr. Yu criticized him for furnishing EM Norton Enterprises buying office with an unsigned draft of his pricing report;

k.   On February 5, 2015, Mr. Yu assigned him to the Tapestry Solution, Inc. case proposal that was marked "Top Secret" clearance and he only possess a "Secret" clearance level;

#### Additional Incidents and *Corrected on September 15, 2015

l.   Between December 2014 to June 2015, Mr. Yu failed to follow the procedures of a PIP when he was not provided guidelines on how it would be conducted and the length of the PIP period was extended and no instructions on how to improve his work were given to him;

m.   On June 2 and 4, 2015, he was interviewed for an internal investigation directed by Col Graham of the workload practices being conducted at DCMA San Diego by Mr. Steve Cleare, DCMA investigator;*

n.   On June 23, 2015, Mr. Yu did not answer his questions regarding him not receiving PIP weekly status reports or final PIP report;

o.   On June 23 or 24, 2015, Mr. Yu made negative comments towards him pertaining to his open pricing case Alliant Techsystems (ATK) Space Systems when informing him of the late status;*

p.   Between July 13 and 17, 2015, Mr. Yu directed employees to place boxes of paper to shred in his cubicle, blocking the emergency fire door exit, and creating a fire hazard;

#### Amended Claim

4.   Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity) when between June 26 and July 27, 2015, Mr. Yu altered his duties when he removed his cases from his workload and reassigned them to other team members, assigned him to duties shredding old files for hours at a time, and denied his request to restore his cost monitoring workload; and

#### Updated Claim

5.   Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity), when on August 21, 2015, Mr. Enger issued him a Removal Decision letter terminating him from Federal service, following the Notice of Proposed Removal issued by Mr. Yu on June 25, 2015?

Q.   What is your full name?

A.   Richard B. Swinton.

#### Your claims are based on age.

Q.   For the record, what is your age?

A.   65.

Q.   What is your date of birth?

A.   April ▮, 1950.

Q.   Were the management official(s) involved in the current complaint at issue, aware of your age?

A.   Yes.

Q.   Please identify them by name, position title, and age.

A.    Yes. It never went back to doing just one job (i.e., I never went back to doing only cost/price analysis work, and at no time was cost monitoring my one and only full time job, I.e., at no time was the full time requirement of DCMA Instruction 123 (at paragraph No. 3.2.1.) ever adhered to).   My job just remained as a one job position (doing full time cost/price analysis work AND doing full time cost monitoring) until the day I was removed.

       At no time was I ever notified that I would no longer be a cost monitor, and cost monitoring was discussed on my June 25, 2015 performance evaluation.

Q.    Were you still performing these duties before you left?

A.    Yes.  For the reasons discussed above, I was doing cost monitoring work, but my continuing cost/price analysis work load made it difficult to get to doing cost monitoring.   Therefore I did very little Cost Monitoring duties.

       For a few weeks prior to being fired, I was doing shredding, but I was never told that this would be permanent.  I never received an SF 50 saying that I was no longer a cost/price analyst, and I ever received a SF 50 saying that I was no longer to do cost monitoring.

       During this period when I was doing shredding (at an annual salary of over $ 99,000 per year, I was the world's most expensive shredder.  I thought that this was clearly a case of fraud, waste and abuse, and I asked my supervisor TWICE via email whether I could go back to doing only one job, which was to do cost monitoring.  Each time I asked, my supervisor, Mr. Yu, told me to keep shredding, even though he knew that at an annual salary of over $ 99,000 per year, this was a waste of government resources, but he did not care.  I do not know why he cared so little about the taxpayer.  I do not know why Mr. Yu cared so little about fraud waste and abuse.

       The last time my position description was rewritten (i.e., to show that cost monitoring was only 20%, per Ms. Garner's arbitrary decision (as part of her fraudulent cover up to hide facts from Headquarters) was in late September 2014, and this was still the document the office was working on at the moment I was fired..

Q.    Have you received a copy of your updated position description and/or your performance plan?

A.    Yes, I received electronically a notification in my office email.  Ms. Kimball and I were given the same information at the same time.  I think you can get a copy from her.

Q.    If so, when?

A.    September 2014.  This was quickly drafted just before the "Pricing Outreach' team arrived (in early October 2014) from Ft. Lee DCMA Headquarters.  This was when the cost monitoring duties were changed and rewritten hastily and arbitrarily determined by Ms. Garner to be 20% of my duties and time (and she set this 20% level without her ever having been to the CPAC120 cost monitoring training, so clearly she did not have a clue as to what was required by Headquarters' official policy and instructions set forth in DCMA Instruction 123).

Q.    Who provided it to you?

A.    Mr. Yu.  And I did receive it electronically in my work email.

*Page 36 of 71 Pages*
Declarant's Initials ___R S___

Q.    Did you go to the union about the violation?

A.    Yes.  But only informally

Q.    Did you file a grievance?

A.    No.

Q.    When?

A.    Since I never did file a formal grievance on being forced to do TWO full time jobs in violation of
DCMA Instruction 123 (at paragraph 3.2.1.), this question is not really applicable.  But I will give
the facts of the useless informal involvement of the union.

All throughout 2014, I was telling the union that it was a violation of official DCMA Instruction
123, which said that cost monitoring was a full time job, and thus with my also doing full time
cost price analyst work, I was doing TWO full time jobs.  The union never had the courtesy to
even read DCMA Instruction 123.  The union local president discussed my issues with Ms.
Garner on an informal basis.  The union was totally worthless on this issue and accomplished
nothing for me as a union member.  I was excluded from the conversations the union had with
Ms. Garner.

Q.    What did the union say regarding the alleged violation of the regulation?

A.    The regulation (DCMA Instruction 123) is clearly written, and says that cost monitoring is a full-
time job.  See paragraph No. 3.2.1 of DCMA Instruction 123.

Furthermore, the fact is that DCMA Headquarters' view is that cost monitoring is STILL
regarded as a full time job AND ALWAYS HAS BEEN a full time job.

The fact that cost monitoring ALWAYS has been viewed by Headquarters is proved by the
following:

1.    DMCA Instruction 123 was issued in August 2013, and has never been changed, despite
periodic reviews of DCMA Instruction 123.  This is strong proof that Headquarters meant
what it clearly said:  Cost monitoring is a full time job.  See paragraph No. 3.2.1. of DCMA
Instruction 123.

2.    The fact that Headquarters has always viewed cost monitoring as a full time job it is always
has been  is proved by statements made to my co-workers a few weeks ago (after I was fired).
They reported to me that the new job opportunity announcement (JOA) for cost monitor says
that the cost monitoring position will be a 100% full time job.  This statement in the JOA is
strong proof that DCMA San Diego management wrong to force me to do TWO full time
jobs (both full time cost/rice analysis AND full time cost monitoring).

3.    Headquarters never revising the full time requirement of cost monitoring and the JOA's
recent statement the cost monitoring is a full time job, is in direct contradiction to Ms.
Garner's actions (in approximately September 2014) in arbitrarily saying that cost monitoring
would only require 20% of my duties.

A.    I went to my psychiatrist. He gave me strong prescription medications that reduced my suicidal thoughts. Management knew about my visits based on my leave requests/

Q.    Are you aware of the agency's Anti-Harassment policy?

A.    Yes, but it is not followed so it is irrelevant.

Q.    How are you aware?

A.    Memorandums.

Q.    Did you complain pursuant to the agency's Anti-Harassment policy?

A.    No. I filed an EEO complaint and wrote to the General a couple of months later.

Q.    Have you received EEO and/or Anti-Harassment/sexual harassment training?

A.    Yes, we have training annually.

Q.    Is it online or is it classroom training?

A.    Sometimes it is online or classroom.

Q.    Are you aware of EEO posters containing Anti-Harassment policies? If so, where are they posted?

A.    I do not think we have any. I think one time we did a long time ago.

Q.    Was the Anti-Harassment policy followed by the management officials involved?

A.    They ignored them/

Q.    To your knowledge, did the agency follow the policies and procedures with respect to the accepted claims (i.e., workload assignments, training, rescinding the AWS, reasonable accommodation, discipline, and issuance of the PIP)?

A.    They violated all of their procedures.

Q.    Do you have any additional information you believe is relevant to the investigation of the accepted claims?

A.    No. I believe that there is a pattern of age discrimination.

## END OF STATEMENT

I, **Richard B. Swinton,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

*Richard Swinton*                                          October 29, 2015

Richard Swinton

_____
(Declarant's Signature)

October 29, 2015

_____
(Date)

**1393**

MSJ-064

001427

# Exhibit 5

MSJ-065



CROWNVIEW
MEDICAL GROUP

November 6, 2014

Name: Richard Swinton
DOB: 04/█1950

To Whom It May Concern:

Mr. Swinton has been under my care since 10/3/14 and has been in treatment for symptoms arising from lack of sleep, loss of appetite and other medical issues. Mr. Swinton has advised me that he has been given new job duties which has caused a higher level of stress and symptoms to flare up. It is my medical opinion that he be limited in the duties performed as originally assigned until the flare ups subside.

Should you have any questions or need additional information, please feel free to contact me.

Sincerely,

Mark Melden, D.O., DABPN
CEO/President of Crownview Medical Group, Inc.

MSJ-066                                                          000542



CROWNVIEW
MEDICAL GROUP

Name: Richard Swinton
DOB: 04/   /1950

To Whom It May Concern:

Mr. Swinton was originally seen 10/3/14 had continual symptoms of stress presenting itself as depression with low energy, decreased concentration. Fleeting thought of suicidal ideation with no intent or plan. These symptoms have interfered with his ability to function socially and occupationally. We discussed that he was taking on more work than he was able to accomplish and this adding to his stress but he says that his company had him in apposition which would usually require two people to complete the two jobs. Patient was on Pristiq which caused adverse side effects of decreased libido, dry mouth, decreased appetite and difficulty urinating and was switched to Brintellix on 11/12/14 and is tolerating the medication much better. His symptoms have decreased and he is more hopeful and less depressed. He has improved energy, concentration, appetite and sleep. Current diagnosis, Adjustment disorder with depression and anxiety, resolving Prognosis is good, patient is being seen monthly and taking medication regularly. Recovery will be small. Patient can return to work without restriction but would strongly recommend that he not return to the position which required two people and return to his original position where he feels he can accomplish without problems.
If he continues with same level work that he was doing before he fell into this crisis I believe the patient will have reimerging symptoms will present work you are asking of him. Patient has rebounded nicely with seeing a therapist, taking medications which allows me to believe that his crisis was mostly situational and not a chronic condition.

Sincerely,

Mark Melden, D.O., DABPN
CEO/President of Crownview Medical Group, Inc.

**158 C Avenue, Coronado, CA 92118**
**(619) 435-5400 P (619) 435-5401 F**

 **DEPARTMENT  HEALTH & HUMAN SERVICES**

January 6, 2015

Mr. Barry Wade
Labor Relations
Defense Contract Management Agency
3901 A Avenue, Bldg. 10500
Fort Lee, Virginia

Case#15-1202

Dear Mr. Wade:

This is a review of the case of Mr. **Richard Swinton**, a DCMA employee requesting a
workplace accommodation.  The medical documentation consists of letters dated
November 6 and December 16, 2014 from Dr. Mark Melden.  I also discussed the case
directly with Dr. Melden.

The medical documentation indicates that Mr. Swinton has been treated for depression
and anxiety which he attributes to his having to do the work of two people because of a
reorganization in his workplace.  He has been treated with medication and psychotherapy
and Dr. Melden believes that his condition is far better now.  He is essentially
asymptomatic at present and Dr. Melden is imposing no restrictions on his ability to
work.

In terms of accommodation, Mr. Swinton does not appear to be disabled at present but
does have a personality that is somewhat perfectionistic.  If given a larger amount of
work to do than is usual he may become symptomatic because of too rigorously
attempting to complete all his tasks to an extent that is more than necessary.  It would be
best not to give him more work than is generally required of his position.  Also, it would
be useful to sit down and prioritize his work with him so that he has a good sense of what
is important and must be done before other work is attempted.  He should also be shown
or reminded of the extent to which work is sufficient on a specific task so that he does not
attempt to do more than required when other tasks need attention.


Sincerely,

Neal L. Presant, M.D., M.P.H.
Occupational Medicine Consultant


MSJ-068

**514**

000547

# Exhibit 6

MSJ-069

| | |
|---|---|
| **From:** | Swinton, Richard B. |
| **Sent:** | Friday, April 17, 2015 11:09 AM |
| **To:** | Knorr, Luralene |
| **Subject:** | FW: Complaint review P8-15-0148  --  Detailed timeline |

Ms. Knorr,

The chain of events are as follows:

1. The original case was opened approx.. Dec. 5, 2014.

2. Then I went on the PIP about Dec. 18, 2015, and then I was on use-or-use annual leave for the rest of the year.

3. I began working on the case in January 2015.

4. In January 2015, I found that the Tapestry solutions subcontract proposal had lapsed.

5. I explained to the requestor (Mr. Tim Appleby of DCMA at the Lockheed plant in Texas) that DCMA does not work on lapsed proposals.

6. I said I would close out his case until Tapestry Solutions could reestablish a new validity date.

7. I was the only employee told to work on a lapsed proposal.  Discrimination.

8. I never got a valid proposal, but I was told to keep working on this case.

9. So I established a second case.  Since the first case was closed, it was necessary to open a second case.  I opened this new case, on the same proposal on or about February 5, 2015.

10. No one had yet given me a full copy of the contract.

11. When I did get a copy of the contract, it was then that I noticed it was a TOP SECRET contract.

12. On or about February 23, 2015, I told Mr. Appleby that it was a top secret contract and that I had only a secret clearance and that this office does not do TOP SECRET  contracts.  I told my supervisor this also at this same time.

13. So my supervisor did not know this originally, but after Feb 23, 2015 he did.

14  I continued working on this case, and this fact is provable by the fact that it remained in etools and that it appears in the weekly PIP meetings notes wherein I explained to my supervisor the status of each case assigned to me.

15. I discussed the TOP SECRET case with the security officer at Tapestry Solution, and this person is specifically named in the TOP SECRET contract.

16. The security person at Tapestry Solution did allow me to have access to rates information.

17. But the security person at Tapestry Solution did not let me have access to job qualification information, which was necessary for me to do a labor survey in order to determine the reasonableness of the pay rates at Tapestry solutions.  It

# Exhibit 7

MSJ-071

# Declaration under Penalty of Perjury

I, Jahn R. Enger, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**EEO Complaint of Richard B. Swinton**
**Agency Docket No.: DCMA-P8-15-0148**

**Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity), by his Defense Contract Management Agency (DCMA) San Diego and Western Regional Command supervisory chain when:**

1. From January 7, 2014 to present, Mr. Danilo L. Yu, Contracting and Pricing supervisor, increased his workload and assigned him Cost Monitor duties in addition to his Contract Price/Cost Analyst duties;
2. Between May 2014 and February 5, 2015, his supervisory chain of command subjected him to harassment. He provided the following information to support his claim:
   a. In May 2014, Mr. Yu failed to provide him with the required pivot tables' training to meet the new cost monitoring report requirements;
   b. On June 9, 2014, Mr. Yu assigned him to the Radeus Labs case, an inadequate subcontract proposal, that had missing key information;
   c. On July 15, 2014, Captain Richard K. McCarthy, U.S. Navy, Commander, DCMA San Diego, did not take action when he informed him that he was assigned the duties of two full-time positions;
   d. On July 15, 2014, Colonel (Col) Glenn Graham, U.S. Air Force, DCMA Western Regional Command, did not take action when he informed him that he was assigned the duties of two full-time positions;
   e. On July 28, 2014, Mr. Yu rescinded his Alternate Work Schedule (AWS) that included the four days/ten hours work option;
   f. On November 13, 2014, he provided medical documentation to Mr. Yu requesting a reasonable accommodation (RA) and to date no decision was provided;
   g. On December 18, 2014, Mr. Jahn Enger, Contracts Director, issued him a Decision to Reprimand following the Notice of Proposed Reprimand he received from Mr. Yu on November 13, 2014, citing failure to follow instructions and meet deadlines;

h.  On December 18, 2014, Mr. Yu issued him a Notification of Unacceptable Performance and Issuance of a Performance Improvement Plan (PIP);

i.  On January 6, 2015, Ms. Tina M. Garner, Deputy Commander, did not take action when he informed her about Mr. Yu not responding to his e-mails pertaining to the Polarix and Solute pricing case proposals;

j.  On January 27, 2015, Mr. Yu criticized him for furnishing EM Norton Enterprises buying office with an unsigned draft of his pricing report;

k.  On February 5, 2015, Mr. Yu assigned him to the Tapestry Solution, Inc. case proposal that was marked "Top Secret" clearance and he only possess a "Secret" clearance level;

**Additional Incidents and \*Corrected on September 15, 2015**

l.  Between December 2014 to June 2015, Mr. Yu failed to follow the procedures of a PIP when he was not provided guidelines on how it would be conducted and the length of the PIP period was extended and no instructions on how to improve his work were given to him;

m.  On June 2 and 4, 2015, he was interviewed for an internal investigation directed by Col Graham of the workload practices being conducted at DCMA San Diego by Mr. Steve Cleare, DCMA investigator;\*

n.  On June 23, 2015, Mr. Yu did not answer his questions regarding him not receiving PIP weekly status reports or final PIP report;

o.  On June 23 or 24, 2015, Mr. Yu made negative comments towards him pertaining to his open pricing case Alliant Techsystems (ATK) Space Systems when informing him of the late status;\*

p.  Between July 13 and 17, 2015, Mr. Yu directed employees to place boxes of paper to shred in his cubicle, blocking the emergency fire door exit, and creating a fire hazard;

**Amended Claim**

4.  Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity) when between June 26 and July 27, 2015, Mr. Yu altered his duties when he removed his cases from his workload and reassigned them to other team members, assigned him to duties shredding old files for hours at a time, and denied his request to restore his cost monitoring workload; and

**Updated Claim**

5.  Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity), when on August 21, 2015, Mr. Enger issued him a Removal Decision letter terminating him from Federal service, following the Notice of Proposed Removal issued by Mr. You on June 25, 2015?

Q.  What is your full name?

A.  Jahn R. Enger.

Q.  **Do you know Complainant**?

A.  Yes. We have both been part of the contracts group for five years.

Q.  What was/is your organizational relationship to Complainant? Are you a co-worker or in his supervisory chain of command?

A.  I was his second-level supervisor for 2 ½ years.

**Complainant's claims are based on age**.

Q.  For the record, what is your age?

A.  56.

Q.  What is your date of birth?

A. It was not due to a violation of the policy or the Collective Bargaining Agreement. Legal thought it might appear to be harassment. In the end, we decided to place Complainant on a five day work schedule to help him reach a fully successful level. At that point, we would revisit it.

Q. Did Mr. Yu discuss this with you?

A. Yes.

Q. Was the AWS rescinded in accordance with applicable policy and procedure?

A. Yes.

Q. If yes, what is it?

A. Collective Bargaining Agreement.

Q. Has anyone else had their AWS rescinded for a similar reason or any reason from July 2012 to July 2014? If so, please identify them by name, position title, and age. To your knowledge, did they have a medical condition or engage in EEO activity?

A. I believe so. This is normally done when individuals have attendance problems not because they were not completing their work. People usually complete their work. I cannot recall who they are.

Q. Was it yours and Mr. Yu's intention to harass Complainant by rescinding his AWS based on his age, medical condition, and EEO activity?

A. Absolutely not.

Q. Was this the first time the AWS was rescinded for performance reasons?

A. Yes, but it was not to harass him, but to get him to a fully successful level.

**Incident f.**
Q. When did Complainant request a reasonable accommodation?

A. We discussed this earlier.

Q. Was a decision ever provided?

A. I did not talk to Complainant about this. There was no reasonable accommodation requested. It was merely a statement that he was stressed and to give him less work to do. The only duties he was assigned were the pricing cases and Mr. Yu was not assigning them like he normally would because Complainant was not completing them on time.

Q. Was Complainant working on the pricing cases?

A. Not with any sense of urgency. They were assigned to him. He probably did not some phone calls, and some typing. He spent time talking to employees and sent very long e-mails pushing his case while at work.

Q.    Did you request a letter from his physician?

A.    We provided the letter from the disability coordinator, who requested some additional information. The request for additional information came through Mr. Yu.

Q.    Was a decision provided to Complainant with regard to Complainant's request for a reasonable accommodation made prior to his departure?

A.    I do not know. I assume Mr. Yu advised him of the FOH's letter. At the time of the FOH letter, Complainant's medical condition had improved and he was receiving weekly feedback from Mr. Yu in accordance with the PIP.

Q.    How do you know Complainant's medical condition had improved?

A.    That is what FOH learned from Complainant's doctor.

Q.    Is there a policy the agency has to follow concerning Reasonable Accommodation requests?

A.    I cannot find a specific policy on our website. Reasonable Accommodation is covered in initial DCMA Supervisor Training and the agency has a specialist to assist supervisors when accommodations are requested or required. The specialist's name is Barry Wade.

Complainant characterizes providing no decision on his RA request as harassment because he thought the response received from FOH was an illogical reason for denying his request. He contends even Dr. Presant said his workload should be reduced and everyone ignored the government doctor's recommendation.

Q.    Please respond.

A.    His workload had already been reduced because he had not been assigned additional cases while on the PIP.

Q.    Was it yours or Mr. Yu's intention to harass Complainant based on no decision being provided based on his age, medical condition, and EEO activity?

A.    No.

## Incident g. and Updated Claim 5.

Q.    Please fully explain what led to the Decision to Reprimand following the Notice of Proposed Reprimand citing failure to follow instructions and meet deadlines and the Removal Decision following the Notice of Proposed Removal.

A.    Complainant had cases assigned. One was with a contractor, who moved back east. The address on the contract had not changed so we were still responsible for it. The pricing case was assigned to Complainant. Complainant took the position that he was not responsible for it and Mr. Yu informed him he was. Complainant sent a disrespectful and insubordinate e-mail to Mr. Yu, myself, Ms. Garner, and the customer about Mr. Yu not knowing what he is not doing. I advised Mr. Yu to seek counsel about Complainant's conduct. Legal recommended discipline for failure to follow instruction and failure to meet deadline. Mr. Yu decided to recommend a reprimand. Complainant provided a rebuttal, I reviewed the rebuttal and requested additional information from Mr. Yu and Mr. Swinton. Ultimately, I approved the proposed reprimand for the Complainant.

A.    Mr. Yu informed Complainant that he needed to complete these. Complainant started sending long e-mails to us, including Ms. Garner. She informed him that she did not have the time to address or respond to every single complaint he made.

Q.    To your knowledge, has anyone else complained that Mr. Yu ignored their e-mails?

A.    No.

### Incident m.

Q.    Fully explain what led to Complainant being interviewed on June 2 and 4, 2015.

A.    He was interviewed after sending a letter to Col Graham and CAPT McCarthy about not following policy. He alleged he was being given twice as much work as anyone else. The investigation was directed by Col Graham in response to Complainant's allegations.

Q.    Were others interviewed?

A.    Yes. I, Mr. Yu, Ms. Garner, and all pricing analysts were interviewed. Complainant was not singled out.

Q.    Did Complainant receive a final report or notification of the outcome?

A.    Not to my knowledge. The only time I saw the report is when I provided it to the EEO office in response to data documents requests. I was given the direction to hire an additional cost price analyst. This person could perform both cost price and cost monitoring duties or perform more cost price duties so that someone else could perform more cost monitoring.

Q.    To your knowledge, was anyone else interviewed on two occasions? If so, please identify them by name, position title, and age. To your knowledge, did they have a medical condition and engage in EEO activity?

A.    I had no knowledge who was interviewed or who was interviewed more than once.

### Incident p. and Amended claim 4.

Q.    Explain what led to Mr. Yu directing employees place boxes in in Complainant's cubicle?

A.    We are in the process of relocating to another location. We have to determine which documents to maintain or remove. If documents were past the archive period, they would be shredded. We had a little project going on and it is still going on. When Complainant was given the results of unsatisfactory performance and notice to remove, Mr. Yu removed his duties from him. Complainant was made part of the project to remove the paper from the folders for shredding. Complainant complained about not being able to do the work because of his back. The plan was that employees would bring the boxes to him. Complainant did not work with any urgency and the boxes piled up. I do not think there was a real fire hazard. I do not think Mr. Yu directed anyone to take anything to Complainant's cubicle. I think it was the employee responsible for the project.

Q.    Who was the responsible employee?

A.    Ms. Gina Strickland

According to Complainant's testimony, he was provided a dust mask.

A. Yes.

Q. If so, when was your most recent training?

A. These are annual. April 2015.

Q. Are they online or classroom?

A. The last one was classroom training.

Q. Are you aware of EEO posters containing Anti-Harassment policies? If so, where are they posted?

A. All policy letters are posted in the break rooms.

Q. Please explain the adverse impact the alleged incidents have on the terms and conditions of Complainant's employment (such as his job, duties, employment status, pay, or benefits).

A. The cost monitoring duties did not adversely affect him. He was not denied pivot training table so he was not affected. Regarding the Radeus Labs, he would not have been affected. Complainant's pay or position was not adversely impacted by rescinding his AWS. The reprimand was an administrative punishment and temporary in nature. It did not affect his pay or employment. The removal action affected him in that he lost his job. The PIP did not affect pay or hours. No other allegation had an adverse impact.

Q. Are there regulations that the Agency must follow with respect to making a decision concerning a request for a reasonable accommodation; assigning workload; providing required training to employees; responding to employee inquiries; rescinding AWS; issuing disciplinary actions, including removal decisions; issuing PIPs; assignment of "top secret" work; removing duties, and reassigning workload?

A. Yes, workload and PIPs are covered under Performance Management. It is not very specific. It does not specifically cite the number of cases assigned to employees. The CBA covers fair treatment. There is no policy concerning training on the Agency website. There are multiple training avenues. All employees are required to gain training listed on the Defense Acquisition University (DAU) website. Reasonable Accommodations are covered in our EEO trainings. New supervisors go through week long training. Regarding discipline, it is covered in Maintaining Discipline DCMA Instruction 608.

Q. To your knowledge, did you and the management official(s) involved follow all appropriate regulatory guidelines and directives with respect to the actions at issue?

A. Absolutely. We sought guidance from legal and LER and did our due diligence to ensure we followed agency procedures.

Q. Do you have any reason to believe or do you have knowledge that the management official(s) involved considered Complainant's age, medical condition/impairment, and EEO activity when making the decision to take the actions at issue?

A. No.

Q.    Did you discriminate against Complainant?

A.    No.

Q.    Do you have any additional information you believe is relevant to the investigation of the accepted claims? Please do not repeat information previously provided.

A.    I think Complainant was given every opportunity to become a fully successful employee. If he had spent time working towards that, he would still be here.

### END OF STATEMENT

I, *Jahn R. Enger,* declare *(certify, verify or state)* under penalty of perjury, that the foregoing is true and correct.

_____          ___23  Oct  2015___
(Declarant's Signature)                                    (Date)

# Exhibit 8

# Declaration under Penalty of Perjury

I, Danilo L. Yu, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

AUTHORITY: *The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

PURPOSE AND USES: *The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**EEO Complaint of Richard B. Swinton**
**Agency Docket No.: DCMA-P8-15-0148**

Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity), by his Defense Contract Management Agency (DCMA) San Diego and Western Regional Command supervisory chain when:

1. From January 7, 2014 to present, Mr. Danilo L. Yu, Contracting and Pricing supervisor, increased his workload and assigned him Cost Monitor duties in addition to his Contract Price/Cost Analyst duties;
2. Between May 2014 and February 5, 2015, his supervisory chain of command subjected him to harassment. He provided the following information to support his claim:
   a. In May 2014, Mr. Yu failed to provide him with the required pivot tables' training to meet the new cost monitoring report requirements;
   b. On June 9, 2014, Mr. Yu assigned him to the Radeus Labs case, an inadequate subcontract proposal, that had missing key information;
   c. On July 15, 2014, Captain Richard K. McCarthy, U.S. Navy, Commander, DCMA San Diego, did not take action when he informed him that he was assigned the duties of two full-time positions;
   d. On July 15, 2014, Colonel (Col) Glenn Graham, U.S. Air Force, DCMA Western Regional Command, did not take action when he informed him that he was assigned the duties of two full-time positions;
   e. On July 28, 2014, Mr. Yu rescinded his Alternate Work Schedule (AWS) that included the four days/ten hours work option;
   f. On November 13, 2014, he provided medical documentation to Mr. Yu requesting a reasonable accommodation (RA) and to date no decision was provided;
   g. On December 18, 2014, Mr. Jahn Enger, Contracts Director, issued him a Decision to Reprimand following the Notice of Proposed Reprimand he received from Mr. Yu on November 13, 2014, citing failure to follow instructions and meet deadlines;

h.   On December 18, 2014, Mr. Yu issued him a Notification of Unacceptable Performance and Issuance of a Performance Improvement Plan (PIP);

i.   On January 6, 2015, Ms. Tina M. Garner, Deputy Commander, did not take action when he informed her about Mr. Yu not responding to his e-mails pertaining to the Polarix and Solute pricing case proposals;

j.   On January 27, 2015, Mr. Yu criticized him for furnishing EM Norton Enterprises buying office with an unsigned draft of his pricing report;

k.   On February 5, 2015, Mr. Yu assigned him to the Tapestry Solution, Inc. case proposal that was marked "Top Secret" clearance and he only possess a "Secret" clearance level;

### Additional Incidents and *Corrected on September 15, 2015

l.   Between December 2014 to June 2015, Mr. Yu failed to follow the procedures of a PIP when he was not provided guidelines on how it would be conducted and the length of the PIP period was extended and no instructions on how to improve his work were given to him;

m.   On June 2 and 4, 2015, he was interviewed for an internal investigation directed by Col Graham of the workload practices being conducted at DCMA San Diego by Mr. Steve Cleare, DCMA investigator;*

n.   On June 23, 2015, Mr. Yu did not answer his questions regarding him not receiving PIP weekly status reports or final PIP report;

o.   On June 23 or 24, 2015, Mr. Yu made negative comments towards him pertaining to his open pricing case Alliant Techsystems (ATK) Space Systems when informing him of the late status;*

p.   Between July 13 and 17, 2015, Mr. Yu directed employees to place boxes of paper to shred in his cubicle, blocking the emergency fire door exit, and creating a fire hazard;

### Amended Claim

4.   Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity) when between June 26 and July 27, 2015, Mr. Yu altered his duties when he removed his cases from his workload and reassigned them to other team members, assigned him to duties shredding old files for hours at a time, and denied his request to restore his cost monitoring workload; and

### Updated Claim

5.   Was Complainant discriminated against based on age, disability, and reprisal (current EEO activity), when on August 21, 2015, Mr. Enger issued him a Removal Decision letter terminating him from Federal service, following the Notice of Proposed Removal issued by Mr. Yu on June 25, 2015?

Q.   What is your full name?

A.   Danilo L. Yu.

Q.   **Do you know Complainant?**

A.   Yes.

Q.   What was/is your organizational relationship to Complainant? Are you a co-worker or in his supervisory chain of command?

A.   I was his first-level supervisor.

### Complainant's claims are based on age.

Q.   For the record, what is your age?

A.   66.

Q.   What is your date of birth?

Communication; Customer Care, Cooperation and Teamwork; and Technical Competency & Problem Solving.

Q.    Please explain the standard policy associated with placing employees on a PIP.

A.    5 CFR Ch. I, Sec.430.207 mandates that employees be assisted in improving unacceptable performance in one or more critical elements at any time during the appraisal period and establishes a performance improvement period (PIP) (normally 90 days) during which the Complainant will have the opportunity to improve his performance. Accordingly, if the Complainant's performance has not improved to Fully Successful (FS) by the end of the PIP, the complainant may be subject to reassignment, demotion or removal from Federal Service.

According to the Notification of Unacceptable Performance and Issuance of a PIP, dated December 18, 2014, this was a 90-day PIP. Complainant's allegation according to incident I. is that Mr. Yu failed to follow the procedures of the PIP by not proving guidelines on how it would be conducted and the length of the PIP period was extended with no instructions on how to improve his work. According to incident n., Mr. Yu did not answer questions concerning weekly PIP status reports of the final PIP report.

Q.    Please respond.

A.    With frequent consultation with the Legal Counsel and the assigned LER, I strongly believed I met all requirements of the "PIP rules" and the PIP itself in accordance with DCMA Instruction 614 Performance Management and the Collective Bargaining Agreement, specifically:

I provided the Complainant the necessary information and notification on how to meet PIP requirements on December 18, 2014. I met with him every Wednesday to review progress and provide feedback and counseling. On weeks where the Complainant or I was not available, I extended the opportunity period to give the Complainant maximum opportunity to demonstrate acceptable performance. In his response to the Deciding Officer, he noted receiving feedback. I kept personal notes during our weekly meeting, but did not provide copies to the Complainant because he was taking his own notes and together we verbally reviewed the results of the counseling at the end of each session.

Q.    Were the provisions followed as outlined in the PIP?

A.    Yes, to the best of my knowledge.

Q.    Were the guidelines of the PIP shared with Complainant?

A.    Absolutely.

Q.    Were they shared verbally or in writing?

A.    Both orally and in writing.

Q.    Did you provide the feedback verbally or in writing?

A.    Both. As per my previous responses, I kept notes and so did the Complainant and together we verbally reviewed the results of the counseling at the end of each session. I always provided the Complainant immediate feedback during our one-on-one counseling sessions; I identified and set priorities, and provided him with examples of acceptable work product.

Q.  Was the PIP extended or was Complainant's performance appraisal period extended?

A.  Yes. As previously stated, ==PIP period was extended== and his 2014 Performance Appraisal was put on hold/extended pending result of PIP.

Q.  Why was he on the PIP for so long (i.e., six months)?

A.  ==Due to leave/absences of the Complainant and me during the holidays, his PIP period was extended to allow him the maximum time identified (90 days) to demonstrate improvement.== Upon completion of the PIP review, I coordinated with Legal and LER before I issued my final determination. The Notice was not issued earlier because of extensive coordination required between the LER, DCMA Santa Ana Counsel, and myself.

Q.  Was a second PIP issued?

A.  No.

Q.  Did Complainant meet the requirements of the PIP on and of the CTMAs or CJEs?

A.  ==Unfortunately not.==

Q.  If not, why not?

A.  ==The Complainant failed to meet the fully successful level of his assigned CTMAs and CJEs at the end of the PIP period.== Please refer to my Memorandum to the Complainant on June 25, 2015 - Notice of Proposed Removal, provided earlier for detail.

Q.  Did Complainant make any attempts to meet the requirements?

A.  Unfortunately not.

Q.  Did Complainant implement any of the recommendations you gave him? Please explain.

A.  Yes, only after several reminders and iterations.

Q.  Was Complainant provided a final outcome of the PIP?

A.  Yes, via my Notice of Proposed Removal to the Complainant.

Q.  If so, when?

A.  June 25, 2015.

Q.  What was the final outcome?

A.  The Deciding Officer concluded and decided to remove the Complainant from the Federal Service on August 21, 2015.

Q.  Before issuing the PIP, did you consult with and/or receive technical advice from HR, legal, or any management officials (i.e., Mr. Enger or Ms. Garner) concerning the PIP?

A.  Yes.

Q.    Are there regulations that the agency must follow with respect to making a decision concerning a request for a reasonable accommodation; assigning workload; providing required training to employees; responding to employee inquiries; rescinding AWS; issuing disciplinary actions, including removal decisions; issuing PIPs; assignment of "top secret" work; removing duties, and reassigning workload?

A.    Yes.

Q.    What are they?  Please identify by name all regulations pertaining to the above and include the date of the policy.  No acronyms please.

- DCMA Instruction 614 - Performance Management dated September 29, 2014;
- DCMA Instruction 120 - Pricing and Negotiation, dated April 1, 2014; and
- Collective Bargaining Agreement - Agreement Between the Defense Contract Management Agency and the AFGE Council 170, signed January 11, 2006.

Q.    To your knowledge, did you and the management official(s) involved follow all appropriate regulatory guidelines and directives with respect to the actions at issue?

A.    Yes, absolutely.

Q.    Do you have any reason to believe or do you have knowledge that the management official(s) involved considered Complainant's age, medical condition/impairment, and EEO activity when making the decision to take the actions at issue?

A.    None whatsoever.

Q.    Do you have any reason to believe that the management officials involved discriminated against Complainant?

A.    None whatsoever.

Q.    Did you discriminate against Complainant?

A.    No, absolutely not.

Q.    Do you have any additional information you believe is relevant to the investigation of the accepted claims?  Please do not repeat information previously provided.

A.    I have no additional information.

END OF STATEMENT

I, **Danilo L. Yu,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____          _____
(Declarant's Signature)                              21 Oct 2015
                                                            (Date)

# Exhibit 9

MSJ-085

Mr. Swinton:

<mark>All your open pricing cases are now re-assigned to other Cost/Price Analysts and no pricing request will be assigned to you until further notice.</mark> In this regard, you are directed to work with Ms. Gina Strickland and provide her with the necessary support to complete her project related to DCMA SD move later this year.

Ms. Strickland is on leave this week but will be back on Monday, 29 June 2015, so please report to her this date.

Thank you,

DANILO LOPEZ YU
Contracting and Pricing Supervisor (WSSAP)
Defense Contract Management Agency - San Diego
7675 Dagget Street, Suite 200
San Diego, CA 92111
Danilo.yu@dcma.mil
858-495-7422

FOR OFFICIAL USE ONLY

IMPORTANT: This e-mail, including all attachments, constitute Federal Government records and Property that is intended only for the use of the individual or entity to which it is addressed. It also may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this e-mail transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify the sender by responding to the e-mail and then delete the e-mail immediately. DCMA appreciates your feedback. Please complete a brief survey at http://pubapp.dcma.mil/CustSat/main.jsp to help us better support your needs. Thank you.

FOR OFFICIAL USE ONLY


-----Original Message-----
From: Yu, Danilo L.
Sent: Friday, June 26, 2015 10:13 AM
To: Gutierrez, Jose A.; Baker, Beverly L.; Cruz, Marivic; Kimball, Lorraine S.; McLaughlin, Jessica L.; Swinton, Richard B.
Cc: Enger, Jahn
Subject: RE: OPEN PRICING CASES

THANKS!!

DANILO LOPEZ YU
Contracting and Pricing Supervisor (WSSAP) Defense Contract Management Agency - San Diego
7675 Dagget Street, Suite 200
San Diego, CA 92111
Danilo.yu@dcma.mil
858-495-7422